**FLORIDA CITIES, Plaintiff,**

v.

**FLORIDA POWER & LIGHT CO., Defendant.**

**No. 79–5101–Civ–JLK.**

United States District Court, S. D. Florida.

Oct. 9, 1981.

Robert A. Jablon, Spiegel & McDiarmid, Washington, D. C., Joseph C. Jacobs, Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, Fla., Alan J. Roth, Daniel Guttman, Marta Manildi, Joseph Van Eaton, Spiegel & McDiarmid, Washington, D. C., Edward Brinson, Kissimmee, Fla., for plaintiff.

Alvin Davis, Steel, Hector & Davis, Miami, Fla., Herbert Dym, Covington & Burling, J. A. Bouknight, Jr., Lowenstein, Newman, Reis & Axelrad, Washington, D. C., for defendant.

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFF'S GAS CLAIM AND GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION ON PLAINTIFF'S NUCLEAR ACCESS CLAIM

JAMES LAWRENCE KING, District Judge.

This cause came on before the Court on motions for summary judgment on plaintiff Tallahassee's nuclear access and natural gas claims. There are three motions before the Court: defendant's motion for summary judgment on plaintiff's nuclear access claim; defendant's motion for summary judgment on plaintiff's natural gas claim; and plaintiff's cross-motion for summary judgment on the same natural gas claim. These motions were made pursuant to Fed. R.Civ.P. 56.

In essence, plaintiff's natural gas and nuclear access claims allege that defendant's actions have injured plaintiff and violated the federal antitrust laws. In the natural gas claim, plaintiff alleges that defendant conspired with a natural gas supplier and a natural gas producer to reduce the quantity of natural gas supplied to plaintiff. In the nuclear access claim, plaintiff alleges that defendant has blocked and continues to block access by plaintiff to nuclear-generated electricity and the associated benefits that result from participation in nuclear power production. The natural gas and nuclear access claims are considered separately below.

*The Natural Gas Claim*

This claim primarily involves four entities: Florida Gas and Transmission Co. (FGT), the alleged exclusive pipeline supplier of natural gas to peninsular Florida; Amoco Production Co. (Amoco), a producer and seller of natural gas and the major supplier of natural gas to FGT; defendant, Florida Power and Light Co. (FPL), a publicly-owned utility; and plaintiff, the City of Tallahassee, Florida. The events which gave rise to plaintiff's natural gas claim against FPL may be summarized as follows.

In 1964, Amoco and FGT entered into a twenty year warranty gas supply contract. The following year, Amoco and defendant entered into a twenty year warranty gas supply contract (the MMBTU contract). The Amoco-FPL agreement allowed either party to legally terminate the agreement if the regulatory permits necessary for the execution of the contract were not obtained within a specified time. A regulatory delay

occurred and Amoco legally cancelled the contract.

In the mid-1960's, defendant contracted with FGT for the transportation of natural gas. The contract required FGT to obtain whatever regulatory approval was necessary to transport defendant's gas, and for FGT to keep defendant informed about "all contracts, authorizations, permits and approvals which may affect the transportation of defendant's gas." *National Gas Transportation Agreement*, Art. II, Par. 3 (Mar. 12, 1965).

On March 1, 1967, the Federal Power Commission (FPC) issued a decision conditionally allowing FGT to expand its gas pipeline. FGT had to show the Commission that it had a stable source of purchaser income.

On March 22, 1967, Amoco and FGT entered into an agreement which has been referred to as the "banking arrangement." This agreement, which apparently was not disclosed to the public or the Federal Power Commission until 1975, modified the existing contract between Amoco and FGT. It permitted Amoco to supply FGT with varying quantities of natural gas instead of uniform quantities as the original Amoco-FGT contract required. Plaintiff alleges that this modification was exacted by Amoco as a *quid pro quo* for the reinstatement of the MMBTU contract between Amoco and defendant. The reinstatement of the MMBTU contract, which occurred in May, 1967, apparently assisted FGT in its attempt to comply with the FPC's March 1, 1967 decision.

Soon after the consummation of the "banking arrangement," Amoco shipped surplus gas to FGT. FGT sold some of this surplus to its customers, and some to a different supplier. In the early 1970's, as prices rose and gas supplies apparently dwindled, Amoco reduced gas supplies to FGT. FGT, in turn, curtailed supplies to its own customers, including plaintiff. Plaintiff had an interruptible supply contract with FGT and thus was vulnerable to cuts in supply. Defendant, on the other hand, had a non-interruptible contract and was protected from such fluctuation under the reinstated MMBTU contract.

Plaintiff essentially contends that FGT, acting as defendant's agent, negotiated the reinstatement of the MMBTU contract for defendant, and that the "banking arrangement" was made with the purpose of reducing—or had the likely effect of reducing—future gas supplies to plaintiff. In addition, plaintiff claims that defendant's actions wrongfully and tortiously interfered with the contract rights of plaintiff.

Defendant contends that FGT did not act as its agent in defendant's efforts to reinstate the MMBTU contract. Defendant asserts that even if it is held that an agency relationship existed, it would be improper to hold defendant responsible for the reduction in gas supplies from FGT to plaintiff because the occurrence of the Arab Oil Embargo and the scarcity of natural gas supplies were not foreseeable in 1967. Defendant further contends that FGT and Amoco had independent business reasons for entering into the 1967 "banking arrangement," and that plaintiff and others believed that natural gas would remain in plentiful supply.

After careful consideration of the record, the comprehensive written submissions of the parties, and the oral arguments of counsel, it is

ORDERED and ADJUDGED that defendant's motion and plaintiff's cross-motion for summary judgment on plaintiff's gas claim are both denied. The Court denies these motions because it finds that there exist genuine issues of material fact, the resolution of which are integral to a judgment as a matter of law. One such controverted fact is defendant's participation in, or influence over, the 1967 "banking arrangement." Whether defendant did in fact conspire with FGT and/or Amoco through the "banking arrangement" to deprive plaintiff of a portion of its natural gas supply is a question that simply can not be satisfactorily resolved based on the existing record. It is clear, however, that the issue of agency is far more concrete than "mere suspicion," as alleged by defendant.

Plaintiff supports its agency theory by referring to an agency provision in the MMBTU contract between Amoco and defendant, an agency provision in the Gas Transportation Contract between FGT and defendant, testimony by Amoco's Harold M. Hawkins,[1] and an internal memorandum of defendant.[2] The Court simply can not conclude on the basis of this evidence, combined with the apparent incentives that defendant had to reinstate the MMBTU contract, that no genuine issues of fact exist with respect to the agency theory.

Other facts remain at issue. One such fact is whether the "banking arrangement" had the purpose or likely effect of diminishing gas supplies to plaintiff. The existence of such disputed material facts, which, if proved, may lead to a violation of federal law, requires this Court to deny summary judgment on the natural gas claim.

*The Nuclear Access Claim*

■ The facts which gave rise to this claim are briefly as follows. Defendant's first nuclear generating plant, Turkey Point No. 3, began operation in 1972. Defendant now owns and operates three nuclear generating facilities—Turkey Point Nos. 3 and 4, and St. Lucie No. 1—and is constructing a fourth facility, St. Lucie No. 2. These units presently provide 29% of the total amount of electricity produced by defendant[3] and, when the fourth unit is completed, will have cost defendant in excess of $1 billion, 650 million. Defendant asserts that these nuclear facilities are extremely cost efficient producers of electricity.[4]

Plaintiff owns a share of Florida Power Corp.'s Crystal River No. 3 nuclear facility but does not own, or deal with, any of defendant's plants. Plaintiff claims that when it notified defendant in 1976 that it was interested in participating in defendant's proposed South Dade nuclear facilities, the request was flatly denied.

Plaintiff contends that defendant has a legal obligation to provide plaintiff with access to nuclear generated electricity for the following reasons: defendant is monopolizing the market of nuclear generated electrical power; defendant achieved and is maintaining his monopoly through anticompetitive means; defendant's behavior has denied plaintiff access to economies of coordination and scale, the benefits of nuclear power production in general, and the ability to compete effectively with defendant; and defendant's development of nuclear power was not innovative or undertaken alone and therefore may not be excused under a "business acumen" defense. Plaintiff further contends that defendant is obligated to deal with plaintiff because defendant's nuclear facilities constitute essential facilities under a "bottleneck theory" of monopolization.[5]

Defendant maintains that even if it concedes for the sake of argument that nuclear-generated electricity is a separate market, that plaintiff is a competitor of defendant, and that plaintiff's lack of access to defendant's nuclear facilities has denied plaintiff the ability to compete effectively with defendant, defendant still has no legal obligation to share its nuclear power facilities with plaintiff. Defendant claims that its nuclear facility acquisitions simply may be attributed to the business acumen of a large firm. Defendant further contends that plaintiff's claim is defective because: plaintiff's request for participation occurred only in 1976, after defendant had assumed substantial risk in constructing and operating its nuclear facilities; plaintiff's expressed interest in participating in defendant's facilities consists only of "opportunity to consider" participation; and defendant is using its nuclear facilities only to supply its

---

1. *See* plaintiff's memorandum in support of its motion for summary judgment (Motion) at 10.

2. *Id.* at 10–11.

3. Affidavit of Robert Gardner (Gardner Affidavit) at 7.

4. *See* "Memorandum of Florida Power & Light Company in Support of Motion for Summary Judgment of City of Tallahassee's Nuclear Access Claim" (Def. Memo) at 3.

5. "Florida Cities' Answer to "Motion to FPL for Summary Judgment of City of Tallahassee's Nuclear Access Claim" (Answer) at 113.

own customers with electricity, not to injure plaintiff.

After careful consideration of the record, the voluminous submissions by the parties, and the oral arguments advanced by counsel, it is

ORDERED and ADJUDGED that defendant's motion for summary judgment on plaintiff's nuclear access claim is granted. This Court recognizes that in considering a motion for summary judgment, it "must construe all pleadings liberally in favor of the party against whom the motion is made, and [that] the motion should be granted only where the moving party is entitled to a judgment as a matter of law and the record clearly shows that no genuine issue of material fact exists." *Dassinger v. South Central Bell Telephone Company*, 505 F.2d 672, 674 (5th Cir. 1974). In the instant case, a liberal construction of the pleadings does not save plaintiff's nuclear access claim from summary judgment.

Plaintiff's claim alleges violations of the Sherman Act, 15 U.S.C. § 1 et seq. Plaintiff argues in its response to defendant's summary judgment motion,[6] that its claim under § 1 of the Sherman Act, 15 U.S.C. § 1, survives a motion for summary judgment.[7] The Court disagrees. Section 1 bears on all contracts, combinations or conspiracies which unreasonably restrict competition. There has been no showing whatsoever by plaintiff that evidences the existence of any such conspiracy, combination, or contract. Defendant apparently sold nuclear generated electricity only to its own customers prior to a recent sale transacted pursuant to a settlement agreement with the Nuclear Regulatory Commission and the Department of Justice.[8] Apparently, no other sales to non-customers have occurred. The one sale, particularly given the circumstances under which the sale occurred, does not indicate a combination or

conspiracy in restraint of trade. Moreover, even if defendant voluntarily initiated sales to non-customers for business reasons, a concurrent refusal to sell nuclear energy to plaintiff does not by itself support a Section 1 claim. Since the Court further finds that defendant in effect, did "go it alone" in developing nuclear power, no Section 1 claim has been made out.

The gravaman of plaintiff's nuclear access lies under Section 2 of the Sherman Act, 15 U.S.C. § 2. This section prohibits monopolization, attempts to monopolize, or conspiracies to monopolize. A violation of this section occurs if the following elements are shown: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U. S. v. Grinnell Corporation*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Plaintiff's nuclear access claim fails to establish a state of facts that would meet either element.

## A. *Monopoly Power*

The Court finds that the relevant market for purposes of Section 2 analysis is not nuclear generated electricity, but electricity generated from all sources, including such fuels as gas, coal and oil. According to *U. S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 396, 76 S.Ct. 994, 1008, 100 L.Ed. 1264 (1956), "In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control." The litmus test under *du Pont* is whether the commodities are "reasonably interchangeable by consumers for the same purposes." 351 U.S. at 395, 76 S.Ct. at 1007. *du Pont's* directives govern the instant case. Although nuclear power may be more cost-efficient than other methods

---

**6.** *See* Answer at 3.

**7.** Plaintiff's Claim under Section 1 does not appear to be specifically alleged in its complaint. However, for the purpose of deliberation on this motion, the Court shall assume a Section 1 violation has been alleged.

**8.** *See* Reply Memorandum of FPL in Support of Motion for Summary Judgment of City of Tallahassee's Nuclear Access Claim: (rep. memo) at 19.

of electricity generation, nuclear generated electricity is simply one type of electricity production. It is likely that consumers use the electricity produced without regard to the production source. Hence, the interchangeability of nuclear generated electricity suggests that this type of electricity production should not be treated as an independent market.

■ Examination of the electricity market reveals that nuclear generated facilities produce but a small share of the total amount of electricity generated. Even defendant, which operates three nuclear facilities, obtains only 29% of its electricity from nuclear power. Moreover, defendant does not control all the nuclear facilities in close proximity to plaintiff. The Crystal River facility and Georgia Power's Vogtle nuclear units are two examples of facilities not owned by defendant.

Under *du Pont* and *Grinnell*, monopoly power exists if an entity controls the price or competition in the relevant market, or owns a predominant share of the relevant market.[9] The Court does not find that defendant has such a predominant share of the electricity market or controls the price or competition in that market. Hence, it does not have the monopoly power under *du Pont* and *Grinnell*. Consequently, plaintiff's Section 2 claim must fail.

**B.** *Willful Acquisition of Monopoly Power vs. Business Acumen*

Even if defendant is deemed to have monopoly power in the relevant market, plaintiff's Section 2 claim still fails. Basically, the Court finds that defendant's acquisition of nuclear generating facilities occurred as a result of defendant's business acumen. Defendant's actions therefore, are protected under the second element of a Section 2 claim. In concluding that defendant's acquisitions were due to business acumen, the Court finds that defendant did not engage

in anticompetitive acts in acquiring or maintaining its nuclear facilities, that defendant's facilities are not bottleneck resources, and that plaintiff has not shown a firm interest in or need for access to defendant's facilities. Plaintiff's attempts to controvert these facts have been unconvincing.

*Business Acumen*

Plaintiff claims that defendant's nuclear facility acquisitions were not due to business acumen. Rather, plaintiff asserts that government assistance, concerted action, and a cautious, risk-averse approach to nuclear power led to defendant's acquisition of nuclear facilities. Plaintiff contends that defendant did not "go it alone" in developing nuclear facilities because defendant was a member of a joint "study group," its nuclear units were "effected by coordination." [10] The Court believes that plaintiff's evidence does not reasonably allow an inference of joint effort. It is to be expected that an entity as large as defendant in a business as interconnected as electric power production interacts with other power producers and even seeks advice. It is improbable that defendant would be able to, or would want to, literally "go it alone." Thus, the Court believes it is unfair to look upon the interactions pointed to by plaintiff as evidence of a joint venture involving defendant. The existence of these interactions does not alter the conclusion that defendant acted alone in developing nuclear power.

A further indication that defendant acted alone in developing nuclear power is the Court's finding that defendant assumed the risk in the construction and operation of its nuclear facilities. There has been no contradictory evidence showing that defendant did not assume such risks or that the risks were not substantial. Plaintiff contends that although nuclear power production may involve some risks, the real risks were taken by "pioneers" and not defendant.[11]

---

**9.** *See* 351 U.S. at 380, 76 S.Ct. at 998, and 384 U.S. at 571, 86 S.Ct. at 1704.

**10.** Statement of Mr. Jablon, counsel to plaintiff, at hearing on September 30, 1981.

**11.** The Three Mile Island disaster, however, is evidence of the on-going risks of nuclear power production. Millions of dollars are surely lost when a facility lies dormant, whether the rea-

The Court finds to the contrary. The extensive outlay of capital required to construct a nuclear facility, combined with the uncertain acceptance of nuclear generated power, indicates that the risks assumed were substantial.

Defendant's assumption of substantial risk in developing nuclear facilities on its own leads this Court to conclude that defendant's acquisition of nuclear generating facilities was simply the result of prudent action by a large firm. And, as noted in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir. 1979), "[a] large firm does not violate § 2 simply by reaping the competitive awards attributable to its efficient size..." Hence, although we find defendant's reliance on *Berkey* is misplaced, plaintiff has not shown that defendant's propitious investments in nuclear power was anything but the sound business judgment of a large firm.

The Court also agrees with defendant that plaintiff's "public domain" argument is irrelevant to the Section 2 Sherman Act analysis. The presence of the Atomic Energy Act Amendments of 1954, P.L.No.83–703, 83d Cong., 1st Sess., indicates that individual electric utilities may indeed construct and operate nuclear generating facilities.

*No Anticompetitive Acts*

There is no evidence that defendant attempted to block or is blocking access by plaintiff to nuclear power participation. As defendant repeatedly stated, it has used its nuclear generating facilities to service its own customers.[12] The recent sale to non-customers was made pursuant to a settlement agreement and does not indicate any sort of discrimination against plaintiff. Furthermore, plaintiff's unsuccessful 1966 attempt to join the Florida Operating Committee has not been shown to have been due to illegal or improper "muscle flexing" by defendant. Rather, it is noteworthy that plaintiff was subsequently admitted to the Committee.[13] Defendant's 1976 refusal of plaintiff's request to participate in defendant's nuclear power production, moreover, has not been shown to be anything but the result of a sound business decision. As defendant has persuasively argued, sale of electricity to plaintiff would have forced defendant to seek alternative energy sources at its own customers' expense.

In addition, plaintiff's allegation that defendant blocked legislation which would have permitted expanded nuclear participation is apparently without merit. E. C. Shreve, Jr., Executive Vice President of Florida Municipal Utilities Association, asserts in his affidavit that the defendant refused to endorse a model statute patterned after the Georgia legislation which created the Municipal Electric Authority of Georgia. Mr. Shreve alleges that defendant's refusal was motivated by anticompetitive concerns. Shreve however, does not allege direct knowledge that such was the case, just that it was his "understanding". There is no additional evidence that defendant was motivated by anticompetitive concerns, or that defendant's actions were not justified by legitimate business reasons.

Plaintiff's 1976 request raises questions about plaintiff's earnestness in seeking nuclear power. Plaintiff's request came well after defendant had commenced operation of a nuclear power facility. Moreover, the request only consisted of an "opportunity to consider" purchasing a share of defendant's facilities or unit power from defendant. There is no indication that plaintiff had a specific plan or even had the necessary approval of the governing board of plaintiff, the Tallahassee City Commission.[14] Without such approval, an agreement of sale would have been meaningless.

There is also inadequate evidence on plaintiff's purported inability to obtain adequate alternative energy sources or to enter into nuclear generation on its own. Plain-

---

son be a breakdown or a denial of regulatory permission to operate.

**12.** *See*, for example, Def. Memo at 6, 8.

**13.** Plaintiff was invited to join the Florida Operating Committee in 1971. *See* Answer at 82.

**14.** *See* Def. Memo at 24, Note 4.

tiff's evidence simply points out that access to defendant's facilities would be more economical to plaintiff than an exploration of alternative sources, and would be more beneficial—and economical—than for plaintiff to start out on its own.

*Bottleneck Resources*

The Court also finds that defendant's generating units do not constitute "bottleneck resources." Plaintiff has not shown that defendant's facilities are essential to plaintiff's electric utility system. Although the essential nature of a facility may potentially present a factual issue, the only showing by plaintiff to this effect has been that access will simply improve plaintiff's existing electricity sources vis-a-vis defendant.

In summation, plaintiff has failed to establish the existence of a genuine issue of fact which would preclude judgment against it as a matter of law. There has been no showing of a contract, combination or conspiracy in restraint of trade, no showing that defendant possessed monopoly power, or, even assuming that defendant had monopoly power, no showing that defendant acquired or maintained its nuclear facilities in violation of the antitrust laws. Basically, plaintiff appears to be seeking the fruits of another's labors without justification. Fairness and the law dictate that defendant should be able to reap what it has sown.