**FLORIDA FUELS, INC., Plaintiff,**

v.

**BELCHER OIL COMPANY, Defendant.**

**No. 87–1025–CIV.**

United States District Court,
S.D. Florida.

June 29, 1989.

John Mariani, Cadwalader, Wickersham & Taft, Palm Beach, Fla., for plaintiff.

Thomas McDade & William Pakalka, Fulbright & Jaworski, Houston, Tex., Richard Williams, Tew Jorden Schulte & Beasley, Miami, Fla., for defendant.

## MEMORANDUM ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE is before the court upon defendant's motion for partial summary judgment filed March 21, 1989. Defendant contends that, as a matter of law, plaintiff cannot prevail on its claim that it was denied access to an essential facility in violation of section 2 of the Sherman Act. 15 U.S.C. § 2.

I. Undisputed Facts

This suit arises out of Florida Fuels' attempt to compete in the market for providing heavy marine fuel oil to South Florida's cruise ship and cargo fleets. Historically, South Florida was not a major shipping port. But, in the mid-seventies, the cruise ship industry began to expand, as cruise line operators took advantage of South Florida's proximity to Caribbean ports of call. Today, the Port of Miami is the largest cruise ship port in the world and Port Everglades, in Fort Lauderdale, is close behind. These two ports and Port Canaveral, near Cocoa Beach, account for nearly two-thirds of all U.S. cruise ship passenger boardings. The cargo shipping sector has also grown, due to extensive trade with the nations of the Caribbean and South America.

Because of operational constraints and a lack of economical facilities elsewhere in the Caribbean, these ships obtain nearly all of their heavy marine fuel oil (also referred to as "bunkers") at their home ports in South Florida. Bunkers are available in different grades and types, but all consist primarily of a blend of No. 6 oil, or dirty oil, and No. 2 oil, a lighter, better refined and more expensive oil. The quality of the base No. 6 oil, the blending, and the delivery temperature all affect the ultimate quality of the product and the functioning of the ship's engines. Ship owners purchase their bunkers in bulk because of the large quantities of fuel consumed. The cruise ships' schedules require a supplier to fuel many ships within a limited period of time. Late deliveries will delay the ships' departure and ultimately cost the cruise line money.

### A. *Belcher Oil Co.*

Defendant Belcher Oil Co. ("Belcher") is based in Miami, marketing a wide range of petroleum products. In Miami, Belcher has a storage tank facility consisting of 15 tanks, located on Fisher Island, near the Port of Miami. Generally, Belcher blends its fuel on the island and then barges the fuel across the channel to service the ships while at berth. Land around the Port is extremely limited and the Port Director has indicated there are no plans for allowing any storage tanks on in the Port property itself. In Fort Lauderdale, Belcher has 30 tanks on 46.5 acres of land in Port Everglades and a system of pipelines servicing all the berths. The fuel is blended and then piped directly to the ships in their berths. Few deliveries are made by barge in Port Everglades. The parties have not presented evidence regarding Belcher's facilities in Port Canaveral, but it appears there are storage tanks there also. The major oil companies have pulled out of the South Florida marine fuel market, leaving Belcher with a monopoly on the supply of bunkers in Port Everglades and the Port of Miami from the mid-seventies until late 1984.

### B. *Florida Fuels*

Plaintiff Florida Fuels, Inc. is also headquartered in Miami and provides bunkers to cruise ships in South Florida. Disatisfied by Belcher's high prices and lackluster service, sectors of the cruise ship industry encouraged the principals of Bahamas Fuels to form a new company, Florida Fuels, to provide competition by selling bunkers. The original plan was to purchase heavy oil and No. 2 oil from a Chevron refinery in Freeport, ship it to South Florida, and fuel the cruise liners directly from special barges, blending the fuel in-line as it was pumped into the vessel. Florida Fuels entered into "requirements" contracts with a number of cruise lines to provide bunkers for certain ships for a year at a pricing formula based on market rates. Florida Fuels hoped to finesse the need for land-based storage with its tanker-barges, passing on savings from price changes quicker and providing a better quality product. Florida Fuels made substantial inroads in terms of total bunker sales made in each port, as shown below, but the vast majority of sales have been under contract.

| | Port of Miami | | Port Everglades | | Port Canaveral | |
|------|---------|-----|---------|-----|---------|-----|
| | Belcher | FF | Belcher | FF | Belcher | FF |
| 1984 | 99% | 1% | 100% | 0% | 100% | 0% |
| 1985 | 63% | 37% | 88% | 12% | 100% | 0% |
| 1986 | 55% | 45% | 85% | 15% | 95% | 5% |
| 1987 | 64% | 36% | 96% | 4% | 97% | 3% |

There is limited space available in the Port of Miami area and the port director has indicated there are no plans to allow fuel storage tanks on the Port property, but plaintiff has never formally proposed to lease or purchase land from the port or to lease space from Belcher. Florida Fuels did suggest the possibility of leasing tank space, but Belcher denied the request because of a lack of capacity. No financial

terms were proposed or discussed. In Port Everglades, a number of oil companies own fuel storage tanks near the Belcher property and there is land available for constructing additional tanks, but Belcher controls the pipeline leading to the berths. Florida Fuels never formally proposed to lease tank space in Port Everglades from Belcher or any oil company and did not request access to Belcher's pipelines. Most of the tankage in Port Everglades is dedicated to clean oil, unsuitable for the storage of dirty oil. Florida Fuels was offered an opportunity by Port Everglades to participate in an expansion of the pipeline system to newly constructed berths, but declined, claiming it had no access to storage tanks.

During the course of this litigation, Florida Fuels prepared a study which determined it was not economically feasible to construct its own tanks, terminal, and pipelines in Port Everglades. The study estimated that construction of the necessary facilities would require a capital investment of 10–11 million dollars and assumed that Florida Fuels would not invest unless it would receive an internal rate of return of at least 15%. Given recent bunker price levels and current bunker demand in South Florida of 400,000 barrels per month with annual 5% increases, the study determined that to realize its desired return of 15%, Florida Fuels would have to sell its bunkers in South Florida at a price of $2.64/bbl to $3.53/bbl above the Platt's U.S. Gulf low.

Florida Fuels contends that Belcher's storage tanks on Fisher Island and its tanks and pipeline system at Port Everglades are essential to competing in the relevant market. Belcher has conceded, for purposes of this motion, that the relevant market is the South Florida bunker market. Since Florida Fuels is apparently not seeking access to Belcher's Port Canaveral facilities and has presented no evidence regarding these facilities, Belcher's Port Canaveral property will not be considered in this analysis.

## II. Summary judgment standard

■ Defendant has moved for partial summary judgment on the essential facilities issue, contending there are no undisputed material facts. The court must grant judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). Defendant will be entitled to summary judgment unless plaintiff has made a showing sufficient to establish the existence of all the elements necessary to its monopoly claim based on the essential facilities doctrine. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A complete failure of proof concerning a necessary element of the nonmoving party's case renders all other facts immaterial. *Id.*, 477 U.S. at 323, 106 S.Ct. at 2552–53.

■ Further, the Supreme Court's recent pronouncements make clear that, in an antitrust claim, a plaintiff must present evidence that tends to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Summary judgment will be granted if, considering the factual context, the antitrust claim is implausible or makes no economic sense. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These standards are not limited to antitrust conspiracy actions. *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487 (11th Cir. 1988). If necessary, defendant must present a valid business justification for denying access to the facility, as an affirmative defense.* Defendant has directed the

---

* Defendant contends that plaintiff has the burden of proving an absence of valid business reasons for refusing to deal and must present evidence that tends to exclude the possibility that the defendant's conduct was as consistent with competition as with illegal conduct. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The *Matsushita* case involved allegations of an antitrust conspiracy and did not involve a unilateral refusal to deal as in this case. The court's reliance on defendant's failure to establish valid business reasons for refusing to deal with plaintiff in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600–01, 105

court to numerous cases in which various courts have granted summary judgment for failure to show that plaintiff was denied access to an essential facility.

## III. Legal analysis

### A. *The Sherman Act*

 The Sherman Act prohibits anti-competitive behavior. 15 U.S.C. § 1 *et seq.* Section 2 makes attempts to monopolize illegal. Although the mere existence of monopoly power does not imply a violation of the Act, the use of monopoly power, no matter how lawfully acquired, to foreclose competition, to generate a competitive advantage, or to destroy a competitor, is unlawful. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). There is no general duty to deal, and in the absence of any purpose to create or maintain a monopoly, a corporation may freely exercise its discretion to conduct business with whomever it wants. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600–01, 105 S.Ct. 2847, 2856–57, 86 L.Ed.2d 467 (1985).

### B. *The essential facilities doctrine*

 But a refusal to deal where a competitor is denied reasonable access to an essential facility is anti-competitive behavior sufficient to support a section 2 claim. *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081 (7th Cir.1983), *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The essential facilities doctrine or "bottleneck" theory derives from the Supreme Court's decision in *United States v. Terminal Railroad*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). In that case, the court determined that competitors should be allowed access to a railroad terminal in St. Louis because it was essential to their ability to compete. *Id.*, 224 U.S. at 386–90, 32 S.Ct. at 507–08. The terminal was the only feasible station for traffic from the west and was controlled by a group of railroads who refused to allow access to

others. This doctrine has been applied in a variety of contexts, requiring access to a football stadium, to newspaper advertising, and to a market building. For a discussion of these and other decisions imposing a duty to deal, see the opinion of Judge Marcus in *Consolidated Gas Co. of Fla. v. City Gas Co. of Fla.*, 665 F.Supp. 1493, 1533 (S.D.Fla.1987). The essential facilities doctrine was formalized in *MCI*, 708 F.2d at 1132–33. The four elements necessary to establish liability are:

(1) control of the essential facility by a monopolist;

(2) a competitor's inability, practically or reasonably, to duplicate the essential facility;

(3) the denial of the use of the facility to a competitor; and

(4) the feasibility of providing the facility.

*MCI*, 708 F.2d at 1132–33. Of course, the essential facilities doctrine and other cases holding monopolists liable for refusing to deal only qualify the general rule that there is no duty to help competitors. *Olympia Equipment Leasing v. Western Union Telegraph*, 797 F.2d 370, 376 (7th Cir.1986).

#### 1. Control of facility by monopolist

 Under this doctrine, a monopolist may not foreclose use of the scarce facility, but must share on fair terms. Monopoly power may be defined as the power to control prices or to exclude competition. *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). In determining whether an entity is a monopolist, a court may consider various factors including control over price, the ability to exclude competition, a market share of greater than 70–80%, and high barriers to market entry. *Consolidated Gas*, 665 F.Supp. at 1519–21. Courts have first defined the relevant geographic and product market and then computed market share from this data. *Id.* at 1519. Although monopoly power is an issue of fact, *Olympia Equipment*, 797 F.2d

S.Ct. 2847, 2856–57, 86 L.Ed.2d 467 (1985), suggest that, if plaintiff has shown that shared use is feasible, then the burden shifts to the defen-

dant to present its valid business reasons for refusing to allow the plaintiff access to the essential facility.

at 374, in this case, Florida Fuels was able to enter the market and capture a substantial share within a short period of time, and the relevant market and market shares are not in dispute. While Belcher clearly was a monopolist prior to Florida Fuels appearance, it is less clear that Belcher has maintained sufficient market share or control over price to be considered a monopolist. But the court will consider the allegations in the light most favorable to the plaintiff and assume that Belcher is, in fact, a monopolist. There is no contention that Belcher obtained its monopolistic power or its facilities in any wrongful manner.

### 2. Practicality of duplicating the facility

■ An essential facility need not be indispensible; but it must be economically unfeasible to recreate and must present a severe handicap on market entry. *See Directory Sales Management Corp. v. Ohio Tel. Co.*, 833 F.2d 606 (6th Cir.1987); *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992 (D.C.Cir.1977). It is insufficient for plaintiff to show that access to the facility is merely "more economical" than other alternatives. *Florida Cities v. Florida Power & Light*, 525 F.Supp. 1000, 1007 (S.D.Fla. 1981).

■ An inquiry into the practicality of duplicating the facility should consider economic, regulatory, and other concerns. Although expensive in absolute terms, the cost of duplication may be reasonable in light of the transactions that would be facilitated and the possible profits to be gained. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 540 (7th Cir.1986). The court's ruling in *MCI*, that AT & T's private long distance circuits were not an essential facility, contemplated that plaintiff should be willing to expend hundreds of millions of dollars to compete with AT & T to duplicate its long distance telephone service. *MCI*, 708 F.2d at 1148. Regulatory requirements may result in costly delays and, in some situations, preclude duplication altogether. *Consolidated Gas*, 665 F.Supp. at 1534; *United States v. Standard Oil Co. of California*, 362 F.Supp. 1331, 1341 (N.D.Cal.1972). Realistically, plaintiff may not be able to create a facility that possesses the same benefits. *See e.g. Terminal Railroad*, 224 U.S. at 383, 405, 32 S.Ct. at 507, 513–14 (physical topography prevented another terminal); *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 194 F.2d 484, 486 (1st Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) (defendant's facilities dominated local trade in fruit and vegetables); *Fishman*, 807 F.2d at 540 (preferences of the National Basketball Association relevant to whether Chicago Stadium is an essential facility for an NBA franchise).

■ Plaintiff's evidence in support of this element is insufficient. In opposition to the motion for partial summary judgment, it has submitted an abundance of excerpts from deposition testimony and its experts' reports, but none of the evidence shows that it is unfeasible to duplicate Belcher's facilities.

The sum of the evidence regarding the Port of Miami only shows that plaintiff believes there are no adequate sites for storage facilities in Miami. Only two potential sites were surveyed, Fisher Island and an old tank farm far up the Miami River. For various legitimate reasons, neither is adequate or practical. The only evidence in support of plaintiff's claim that there are no available sites in or near the Port is bald statements by Douglas Lathrop, Florida Fuels' president. There is no further documentary evidence nor any showing why other sites are unsuitable. There is no showing that plaintiff actually proposed leasing space from the Port or applied to the Port to revise its long range plan. In its inquiries to Belcher, plaintiff never specified the amount of storage it needed, never proposed financial terms, and did not discuss other management considerations. Belcher's actions clearly indicate it did not intend to share its facilities and plaintiff has no duty to make specific proposals, but a denial of a specific proposal would have been helpful to a factfinder in determining whether it was unfeasible to recreate Belcher's facilities. The report of plaintiff's expert, Brent Dibner incorrectly claims that environmental regulations preclude construction of storage facilities and a tanker terminal. The Florida Aquatic

Preserve Act does designate Biscayne Bay as an aquatic preserve, but dredging and the construction of docks and piers is permitted, if certain guidelines are followed. *See Fla. Stat.* § 258.397(3)(b)3. This report is also replete with bald statements that no adequate property is available, unsubstantiated by documentary evidence or otherwise.

Much of the same class of evidence is offered to support the claim that plaintiff should be allowed access to plaintiff's Port Everglades' facilities. Although most of the oil tanks owned by other oil companies with facilities in Port Everglades are used for clean storage and may not easily convert to dirty oil storage, there were no specific proposals made to any of the owners. There is no evidence of a study to compare the cost of construction of new facilities with the cost to convert existing tankage. Plaintiff declined an opportunity to participate in a plan to extend pipelines to newly constructed berths. Its experts' reports establish an obvious point, that construction of storage tanks and pipelines is expensive. But, as both parties note, the South Florida market is burgeoning and potentially lucrative, among the top ten bunker fuel markets in the U.S. The potential economic gains to be reaped from an investment are substantial.

Further, Florida Fuels has failed to make a showing that its existing facilities, the water-based barge and tanker system, does not reasonable duplicate Belcher's land-based tank, pipeline, and barge system. Florida Fuels has captured a substantial portion of the South Florida market in an short period of time, with a minimal capital investment. While plaintiff has listed the numerous disadvantages of a water-based bunker supply system, and a jury could well find that a land-based storage facility is inherently more efficient, there is no evidence that tends to show that plaintiff *cannot* compete with its system of barges and tankers. Plaintiff's original business proposals stated that, with its supply contract from Chevron in Freeport, it could supply a better quality product. A water-based system's advantages include mobility, expandability, flexibility, minimal maintenance costs, and minimal capital invest-

ment. Plaintiff has come forth with no evidence tending to show that its purported inability to maintain an adequate market share is only a result of its inability to duplicate Belcher's facilities, and not a result of its failure to provide quality service or because of Belcher's alleged predatory pricing practices. A showing that Belcher's facilities are merely "more economical" than Florida Fuels' barge system is insufficient to establish liability under the essential facilities doctrine. *Florida Cities*, 525 F.Supp. at 1007.

There is evidence that Florida Fuels has been offered access to Florida Power & Light ("FP & L") tanks in West Palm Beach. Utilizing these tanks would allow Florida Fuels to buy in bulk, to store product and mix at its leisure, and to minimize fluctuations in market prices. While this facility does not totally eliminate the higher transportation costs that Florida Fuels must bear, plaintiff has not presented specific evidence that this would not be a reasonable duplication of Belcher's facilities.

There is insufficient evidence from which a jury could conclude that economical considerations, regulatory schemes, environmental regulations, or other concerns preclude Florida Fuels from reasonably or practically duplicating Belcher's facilities. Considering the undisputed factual context of the bunker fuel market in South Florida and the various positives and negatives associated with either a land-based storage and delivery system or a water-based system, plaintiff's claims are implausible and fail to meet the *Matsushita* standard for a plaintiff's burden when faced with a motion for summary judgment. Basically, the pleadings, depositions, documentary evidence, and affidavits do not establish a plausible claim that plaintiff is practically precluded from reasonably duplicating Belcher's facilities.

Plaintiff's essential facility theory requires Florida Fuels to present competent evidence that it cannot duplicate Belcher's tanks and pipelines. Plaintiff has been unable to clear this initial hurdle. A failure of proof on any element of plaintiff's case compels entry of summary judgment in favor of defendant, *Celotex*, 477 U.S. at

322, 106 S.Ct. at 2552. Because plaintiff cannot prevail as a matter of law, any further disputed facts are immaterial. But, in light of the complexity of the claim and for purposes of analysis, the court will review the other elements of plaintiff's essential facilities theory of antitrust liability.

### 3. Denial of use

Plaintiff never specifically presented any proposed terms for rental payments or access to the facilities in question, primarily because defendant dismissed plaintiff's inquiries out of hand. This refusal to deal constitutes a denial of use, but evidence of a specific proposal would assist the factfinder in determining whether the denial was unreasonable or finding that defendant possessed an essential facility.

### 4. Feasibility of sharing

Plaintiff has presented adequate evidence to establish a factual question as to whether it is feasible to share Belcher's facilities. Its evidence regarding the number times Belcher turns over the capacity of its tanks tends to show that Belcher is under-utilizing its facilities. Evidence that Belcher and others share facilities in other markets and actually mix product indicates such an arrangement may be feasible in South Florida. However, plaintiff's evidence regarding a fair price for leasing space and its evidence that Belcher's docking facilities are adequate to support more intensive use of its tanks is less persuasive. It is sufficient to present a question of fact and would prevent the granting of summary judgment had plaintiff come forward with sufficient evidence on the practicality of duplication element.

### 5. Whether valid reason for refusing to deal

Defendant asserts that it has a valid business justification for refusing to deal. This claim is an affirmative defense, related to the feasibility of sharing the essential facility, but analyzed separately. *Aspen Skiing,* 472 U.S. at 605, 608, 105

S.Ct. at 2858–59, 2860; *MCI,* 708 F.2d at 1081; *United States v. Multi–List, Inc.,* 629 F.2d 1351, 1371 (5th Cir.1980); A monopolist's self-serving, *ex post facto* business justifications must be examined with care. *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 858 (6th Cir.1979). Of course, when faced with a motion for summary judgment in an antitrust claim, a plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct. *McGahee,* 858 F.2d at 1493. Belcher contends it does not have sufficient space at Miami in its tanks or at its docks to share its facilities. On its face, this appears to be a legitimate justification, but plaintiff has presented evidence that Belcher offered an extra tank to its current lessor, FP & L, suggesting that Belcher is illegally precluding a competitor from access to its facilities in favor of a non-competitor. While a monopolist has no duty to cooperate with its business rivals, it is not an unqualified right, *Aspen Skiing,* 472 U.S. at 600, 105 S.Ct. at 2856, and the fact-finder must determine whether the business justification is valid, or rather, that the monopolist is illegally attempting to perpetuate its hold on the market. On this issue, plaintiff has also presented as issue of fact, although it is immaterial because of the court's conclusion in section 2, above.

### C. An overview of judicial approaches to the duty to deal

This is a case of pre-existing vertical integration by a monopolist. Prior to Florida Fuels' arrival, Belcher supplied all the marine fuel oil in the relevant market and controlled all storage and delivery systems. This is unlike any of the situations in which the Supreme Court has imposed a duty to deal. The Court's approach to this question has been analyzed in different contexts,** but, in cases imposing a duty to deal, the Court has not required an unregu-

---

** One commentator has noted that courts will impose a duty to deal upon a monopolist in two circumstances: (1) where a single monopolist who competes with the facility user in other markets unilaterally controls the facility, *see e.g. Aspen Skiing,* 472 U.S. 585, 105 S.Ct. 2847; *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Lorain Jour-*

lated monopolist, acting independently, to share its facility with a competitor with which it has had no prior history of dealing. Both *Terminal Railroad,* 224 U.S. 383, 32 S.Ct. 507 (consortium of railroads must allow access to terminal), and *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (power company must allow municipalities access to transmission lines), involved highly regulated industries. The Court found, in *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944), that the *concerted* effort of AP members to limit membership and prevent competitors from gaining access to the news was a violation of the Sherman Act. Florida Fuels is not precluded from purchasing heavy marine oil from Belcher, unlike *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), where the Court held that a newspaper may not refuse to sell advertising to persons patronizing a small competing radio station. Of course, the parties in *Aspen Skiing,* 472 U.S. 585, 105 S.Ct. 2847, had engaged in cooperative ventures and joint marketing for many years. In the instant case, the parties have no history of dealing, thereby complicating the court's ability to enforce a duty to deal if one did exist. Plaintiff's request for access to the equivalent of Belcher's plant is, under these circumstances, unprecedented.

While the Eleventh Circuit has not applied the essential facilities doctrine to require access, those circuit courts which have forced a monopolist to share, have done so under dissimilar facts. In *Gamco,* often cited as an early application of the doctrine, the court found a Sherman Act violation where there was a *concerted* refusal to allow plaintiff to sell his goods at a community market. *Id.,* 194 F.2d at 489. The few circuit courts explicitly finding that the essential facility doctrine could apply involved truly unique facilities. *See Hecht,* 570 F.2d at 992 (jury could be permitted to find that RFK stadium was an essential facility); *MCI,* 708 F.2d at 1133, 1147 (sufficient evidence for jury to find

that portions of AT & T's nationwide telephone system were essential facilities); *Fishman,* 807 F.2d at 539–40 (district court did not err by determining that Chicago Stadium was an essential facility). Another line of appellate decisions clearly establish that hospitals and their specialized treatment centers are not essential facilities for doctors. *See e.g. McKenzie v. Mercy Hospital of Independence, Kan.,* 854 F.2d 365 (10th Cir.1988).

In economic terms, since both Belcher and Florida Fuels have freedom in obtaining their source fuel from whomever they wish, if consumers (in this case, cruise ship owners) behave rationally, then their choices will be dictated by price and quality. The more efficient supplier, providing better service, should be the stronger competitor. Because Belcher is a natural monopoly, Florida Fuels could only enter the market if it could provide a more efficient service. Plaintiff has submitted evidence that marine fuel oil prices in South Florida prior to 1985 were inordinately higher than in other markets and that the cruise lines were dissatisfied with Belcher's quality of service. It is appropriate for a court to examine the effect of the challenged pattern of conduct on consumers. *Aspen Skiing,* 472 U.S. at 605, 105 S.Ct. at 2858–59. There is no denying that Florida Fuels' entry into the market provided competition that has encouraged lower prices and better service. The question before the court is not whether Belcher's pricing is predatory, but whether Florida Fuels can efficiently compete without access to Belcher's facilities. Florida Fuels has not presented the threshold quantum of evidence necessary to survive Belcher's motion for summary judgment which places into issue whether Belcher's tanks and pipelines are necessary for Florida Fuels to compete or cannot be practically or feasibly duplicated by Florida Fuels.

D. *Admissibility of evidence related to Belcher's refusal to deal*

 Because plaintiff has not presented sufficient evidence from which a

---

nal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); and (2) where a monopolist consortium of firms who are competitors jointly controls the facility, *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Terminal Railroad, supra.*

factfinder could determine that Belcher controls essential facilities, defendant has no duty to provide plaintiff access to its tanks and pipelines, and any evidence related to its refusal to allow access is inadmissible. While, in some situations, a monopolist will be required to deal with a competitor, and Belcher may not refuse to sell fuel to Florida Fuels merely because it is a competitor, here Belcher's refusal to lease its tank space is not evidence of monopolistic intent. Any consideration of this evidence by the jury would only be prejudicial and is therefore excluded, pursuant to Rule 403 of the Federal Rules of Evidence. Without ruling on the merits of this aspect of the case, the record indicates that plaintiff intends to present to the jury evidence that defendant has engaged in predatory pricing with monopolistic intent. Certainly, this type of evidence alone will support a finding of Section 2 liability.

After a careful review of the pleadings and the court being fully advised in the premises, it is hereby:

ORDERED and ADJUDGED that defendant's motion for partial summary judgment is GRANTED. This Section 2 claim shall be tried on the predatory pricing claim only.

It is further ORDERED that final judgment is hereby entered as to the essential claim as the court finds no reason for delay pursuant to Rule 54(b). The court further finds that this order involves a controlling question of law as to which there is substantial ground for difference of opinion as there is no controlling precedent from the Eleventh Circuit and that an immediate appeal from this order may materially advance the ultimate termination of this litigation. *See* 28 U.S.C. § 1292(b).

DONE and ORDERED.