BELCHER OIL COMPANY, Plaintiff,

v.

FLORIDA FUELS, INC., Douglas R. Lathrop, Todd W. Huinker, Vardis Vardinoyannis, Theodore Vardinoyannis, Spyros Konofaos, George Georgacopoulos, International Marine Sales, Inc., Stig Host, Davidson D. Williams, Tortugas Shipping Company, S.A., Quiver Companie Naiviera, S.A., Lathrop and Associates, Bahama Fuels Corporation, Svenn H. Dahl, Kloster Cruise Limited, and Florida Marine Towing, Inc., Defendants.

No. 89-0509-CIV.

United States District Court,
S.D. Florida,
Miami Division.

Nov. 6, 1990.

---

11. Calamari & Perillo, *The Law of Contracts,* (3d Ed.), s. 9–40.

Thomas R. McDade, William R. Pakalka, Houston, Tex., Richard L. Williams, and Neil O. Bowman, Miami, Fla., for plaintiff.

John F. Hoffman, John F. Mariani, Palm Beach, Fla., Richard H. Critchlow, Mara Beth Sommers, Herschel E. Sparks, Jr., Miami, Fla., and Bruce R. Kelly, New York City, for defendants.

OPINION

RYSKAMP, District Judge.

THIS CAUSE is before the court on the motion for summary judgment of defendants Florida Fuels, Inc. ("Florida Fuels"), Douglas R. Lathrop, Todd W. Huinker, International Marine Sales, Inc., Stig Host, Davidson D. Williams, Lathrop and Associates, and Florida Marine Towing, Inc., filed May 19, 1989.[1] Having carefully reviewed the record, the parties' exhaustive memoranda, the applicable case law, and having conducted a hearing on this matter, the court now issues the following opinion.

## I. BACKGROUND

This suit, along with a related suit between Florida Fuels and Belcher, *Florida Fuels, Inc. v. Belcher Oil Co.*, 717 F.Supp. 1528 (S.D.Fla.1989), arises out of the attempt by some, if not all, of the defendants in the present matter to create competition in the market for the sale of heavy marine fuel oil ("bunker fuel") in South Florida.[2] From the mid–1970s until late 1984, this market was controlled entirely by Belcher.[3]

In February, 1984, a number of South Florida cruise ship operators, some of whom are defendants in this action, held two meetings at which they discussed their dissatisfaction with both the price and quality of the fuel they were purchasing from Belcher. The explicit purpose of these meetings was to explore "alternative bunkering possibilities," i.e., ways of circumventing Belcher's monopoly, and the participants resolved to find a new supplier to compete with Belcher. The ship operators subsequently encouraged the formation of Bahama Fuels Corporation, the predecessor of Florida Fuels, which made a number of parallel proposals to provide bunker fuel to various cruise ships. These proposals led in turn to responses and agreements between Bahamas Fuels and some of the ship operators for the supply of bunker fuel, so

1. On May 3, 1990, plaintiff dismissed without prejudice defendants George Georgacopoulos, Tortugas Shipping Company, S.A., and Quiver Companie Naviera, S.A. The other named defendants are not moving parties on the present motion for summary judgment.

2. For a lengthier description of the background of these two companies and of the South Florida bunker fuel market, *see Florida Fuels,* 717 F.Supp. at 1529–31.

3. *Florida Fuels,* 717 F.Supp. at 1533, 1536.

that by late 1984, the cruise ship operators had achieved their objective of bringing a competitor into a market previously controlled by one supplier.

The plaintiff brought suit, alleging that the defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1,[4] by conspiring to engage in price fixing, a concerted refusal to deal with the plaintiff ("group boycott"), and unfair business conduct. The plaintiff seeks recovery under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.[5]

Belcher contends that it was injured by a scheme whereby a number of cruise ship operators conspired to enter into identical contracts with Florida Fuels for some or all of their bunker fuel requirements. Under this alleged conspiracy, the ship operators collectively committed themselves to purchasing a volume of bunker fuel sufficient to ensure that Florida Fuels' venture would be profitable, thereby denying Belcher the opportunity to sell any of the fuel needed to satisfy that portion of the market demand covered by Florida Fuels' contracts. Belcher characterizes this conduct as a per se illegal group boycott facilitated by a per se illegal price fixing agreement.[6]

The moving defendants seek summary judgment on the grounds that (1) any concerted action by the defendants fostered, rather than harmed competition, and that the plaintiff therefore lacks antitrust standing, (2) the defendants lack market power, and (3) the plaintiff has not presented sufficient evidence of price fixing or a concerted refusal to deal. In essence, Florida Fuels and its co-defendants argue that the fact that the alleged conspiracy promoted, rather than harmed, competition indicates that the defendants' conduct cannot be in violation of the antitrust laws, and that summary judgment is therefore appropriate.

## II. SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure dictate that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Further, although the moving party bears the initial burden of demonstrating an absence of any genuine issue of material fact, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case," because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

## III. ANALYSIS

### A. THE ANTITRUST INJURY REQUIREMENT

"The antitrust laws were enacted for 'the protection of *competition*, not

---

**4.** Section 1 of the Sherman Act provides in pertinent part: "Every contract, combination ... or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1.

**5.** Section 4 of the Clayton Act is a remedial provision that makes available treble damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Section 16 is an equitable provision that provides for injunctions "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.

**6.** Under the so-called "per se" antitrust doctrine, certain categories of business practices are deemed to be so blatantly anticompetitive that it would be inefficient and unwise for courts to examine the effects of such practices in particular cases under the alternative "rule of reason" analysis. E.g., *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Practices which have been held to be *per se* unlawful include price fixing, *see, e.g., United States v. Trenton Potteries Co.*, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927), and group boycotts, or concerted refusals to deal, *see, e.g., Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 211–12, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959).

*competitors.'*" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). This frequently cited observation is the basis of the requirement that a private antitrust plaintiff show antitrust injury, as enunciated by the Supreme Court in *Brunswick*, and reaffirmed in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), and *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. ——, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).[7] Antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697, 50 L.Ed.2d 701.

The antitrust injury requirement means that it is not enough for a plaintiff to show that it has sustained injury causally connected to acts of the defendants that violate the antitrust laws. P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 334.2a (Supp. 1989). Beyond this, the plaintiff must show that "the defendants' activities have the effect of stifling competition," *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 723 (11th Cir.1984), and that the plaintiff's injury flowed from that anticompetitive effect.

■ The need to satisfy the antitrust injury test is not affected by the degree of egregiousness with which the defendants are alleged, or even proven, to have violated the antitrust laws. Even per se antitrust violations are not actionable by private plaintiffs absent a showing of antitrust injury. *Atlantic Richfield*, 495 U.S. at ——–——, 110 S.Ct. at 1893–95, 109 L.Ed.2d at 348–50. Therefore, in order to overcome a summary judgment motion, a private antitrust plaintiff seeking to recover for losses growing out of an alleged

conspiracy to facilitate the entry of a new firm into the market must proffer evidence that it has suffered injury different in kind from losses it could incur as the result of the entry of a new firm into the market by legitimate means. *See Brunswick*, 429 U.S. at 486–87, 97 S.Ct. at 696–97, 50 L.Ed.2d 701 (allegedly unlawful acquisition of plaintiff's competitor which prevented competitor from going bankrupt did not cause antitrust injury where lawful acquisition would have caused plaintiff to suffer the identical "loss"); *see also Cargill*, 479 U.S. at 116, 107 S.Ct. at 492, 93 L.Ed.2d 427 (no antitrust injury from merger of two competitors forcing plaintiff to lower prices); *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir.1990) ("[T]he mere fact of increased competition and reduced profits resulting from an agreement between other parties does not constitute an antitrust injury to the plaintiff."). Belcher has proffered no such evidence.

■ Hypothetically, an oil company called "X" might, on its own initiative, have offered bunker fuel supply contracts identical to the contracts that Belcher now challenges to the same cruise ship operators that in reality entered into contracts with Florida Fuels. Continuing the hypothesis, each of those ship operators, motivated by lower prices and the promise of a newly competitive market, might have rationally and independently accepted X's offer without giving Belcher the opportunity to make a counter-offer. Under such a scenario, there would have been no conspiracy and no illegal conduct, yet Belcher would have sustained injuries identical to those for which it now seeks recovery. This hypothetical scenario illustrates that the losses that Belcher now complains of were the result not of the defendants' allegedly illegal conduct, but of increased competition, and that these losses therefore do not constitute antitrust injury. For this reason, summary judgment is appropriate as to each of Belcher's claims, as explained *infra*.

7. While the scope of the *Brunswick* decision was limited to cases for treble damages under section 4 of the Clayton Act, *Cargill* extended the application of the antitrust injury requirement to equity actions under section 16.

## B. CLAIMS ASSERTED

### 1. *Price Fixing*

While Belcher focuses a substantial portion of its argument on the issue of price fixing (as do the defendants), its allegations in this regard are somewhat confused. Belcher's first amended complaint alleges that the defendant cruise ship operators "agreed to fix the *minimum* prices that they would pay [to Florida Fuels]." (Emphasis in original). In its supplemental opposition to the motion for summary judgment, Belcher states that it "has alleged a horizontal conspiracy among competing ship operators to boycott Belcher and *depress and fix* marine fuel oil prices." (Emphasis added).

Viewed in isolation, an agreement by buyers to fix minimum prices makes no economic sense. Such an agreement can only injure consumers by reducing competition among sellers and raising prices. Furthermore, such an agreement will ordinarily benefit sellers by allowing them to enjoy higher prices and/or greater output than they would in a fully competitive market. *See* P. Areeda & H. Hovenkamp, *supra*, at ¶ 340.2c. In such a situation, a seller is not injured in fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986). Belcher is therefore unable to make an independently cognizable claim for minimum price fixing by its competitors, its customers, or both.

Although Belcher's supplemental opposition to defendants' motion for summary judgment suggests a maximum price fixing scheme, no such allegation is made either in the complaint, or in any amendment thereto. In any event, a maximum price fixing agreement does not cause a seller antitrust injury unless it results in predatory pricing, *Atlantic Richfield*, 495 U.S. at ———— , 110 S.Ct. at 1891–92, 109 L.Ed.2d at 346–47,[8] which has not been

alleged here. Belcher therefore cannot show the requisite antitrust injury to maintain a claim for maximum price fixing.

The only way that Belcher's price fixing allegations are conceivably cognizable is as part and parcel of the group boycott allegation. Indeed, Belcher's first amended complaint, which added the price fixing allegations to its original complaint, characterizes the alleged price fixing agreement "[a]s part of the conspiracy and in order to effectuate the concerted refusal to deal with and to boycott Belcher." This court therefore holds that the plaintiff has no independently cognizable claim for price fixing, and that any claim the plaintiff may have for "price fixing" is subsumed within the group boycott claim. It is therefore necessary for Belcher to satisfy the antitrust injury requirement as to the group boycott claim in order to proceed to trial on allegations of either a group boycott or "price fixing."

### 2. *Group Boycott (or "Concerted Refusal to Deal")*

To maintain its group boycott claim, Belcher must proffer evidence of "injury of the type [the prohibition on group boycotts was] intended to prevent and that flows from that which makes [the alleged group boycott] unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697, 50 L.Ed.2d 701. It is not enough for Belcher to submit evidence that (1) the defendants unlawfully conspired to engage in a per se illegal boycott against Belcher, and (2) Belcher sustained economic injury as a result of that illegal boycott. *See* P. Areeda & H. Hovenkamp, *supra*, ¶ 334.2a. To overcome the motion for summary judgment, Belcher must offer evidence that "the defendants' activities have the effect of stifling competition," *Midwestern Waffles*, 734 F.2d at 723, and that Belcher sustained injury as a result of that anticompetitive effect. *See* Part III.A., *supra*.

---

**8.** Belcher attempts to distinguish *Atlantic Richfield* on the ground that it concerned a claim of a vertical maximum price fixing conspiracy, whereas the instant case concerns an alleged horizontal maximum price fixing scheme. This distinction is irrelevant to the question of anti-

trust injury. *Atlantic Richfield* clearly states that "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect." 495 U.S. at ———, 110 S.Ct. at 1892, 109 L.Ed.2d at 347.

As an initial matter, Belcher is in a very difficult position to show antitrust injury of any kind. Belcher is, after all, an erstwhile monopolist seeking to maintain a private antitrust action against the parties who recently ended Belcher's monopoly and brought competition to the South Florida bunker fuel market for the first time in a decade. *See Florida Fuels*, 717 F.Supp. at 1530. To overcome the defendants' summary judgment motion, Belcher must provide evidence that the defendants stifled competition by means of the very same acts which created competition by ending Belcher's monopoly. Such a showing would presumably require evidence of predatory conduct by Florida Fuels once it had entered the market.

■ The fundamental reason that group boycotts, or concerted refusals by merchants to deal with other merchants, have long been held to be forbidden by the antitrust laws is that they restrict the ability of merchants to freely participate in the market, and therefore have "a monopolistic tendency." *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 211–213, 79 S.Ct. 705, 708–710, 3 L.Ed.2d 741 (1959) (quoting *Standard Oil Co. v. United States*, 221 U.S. 1, 57, 61, 31 S.Ct. 502, 514, 516, 55 L.Ed. 619 (1911)); *see, e.g., Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). The particular anticompetitive effects that the antitrust laws' prohibition on group boycotts are intended to prevent are the denial of market access and "relationships . . . competitors need in the competitive struggle," *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (quoting L. Sullivan, *Law of Antitrust* 261–62 (1977)).

Although Belcher has shown that it lost a considerable amount of business and monopoly profits due to the contracts entered into between Florida Fuels and the cruise ship operators, the uncontroverted evidence submitted to the court indicates that Belcher has continued to do business with a majority of the purchasers in the South Florida bunker fuel market, including some of Florida Fuels' customers, throughout the time of the alleged conspiracy. Belcher also continued to be responsible for a substantial majority of total bunker sales in South Florida. *Florida Fuels*, 717 F.Supp. at 1530. Belcher has therefore failed to proffer evidence that it has been denied market access or relationships that it needs to compete.

In any event, there is no evidence before this court suggesting that defendants' acts, which culminated in the creation of a competitive market where no competition had previously existed, stifled competition. Summary judgment shall therefore be granted as to Belcher's first cause of action under section one of the Sherman Act, encompassing the price fixing and group boycott allegations, on the ground that the plaintiff has failed to make a showing sufficient to establish the existence of antitrust injury, an element essential to its case.

### 3. *Unfair Business Conduct*

The second cause of action in Belcher's original complaint is for restraint of competition by unfair business conduct in violation of section 1 of the Sherman Act. However, the complaint fails to allege injury to competition as to this cause of action. In any event, as stated *supra*, Belcher has offered no evidence of injury to competition, which is clearly an essential element of this cause of action. Summary judgment shall therefore be granted as to Belcher's second cause of action.

### IV. CONCLUSION

Assuming that the defendants' conduct here challenged by Belcher was in fact illegal, it was illegal not because it increased competition, but in spite of that fact. It is therefore apparent that any "injury" sustained by Belcher did not "flow[ ] from that which makes defendants' acts unlawful," *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697, 50 L.Ed.2d 701. Rath-

er, Belcher's losses were the result of increased competition. The essential purpose of the antitrust injury requirement is to preclude any recovery for such losses. *Id.* Summary judgment as to all defendants will therefore be granted by separate order.