**FORD MOTOR COMPANY, Plaintiff,**

v.

**Robert LANE, Defendant.**

**No. 99–74205.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 3, 2000.

**OPINION & ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS (COUNTS I & II)**

EDMUNDS, District Judge.

This matter comes before the Court on Plaintiff Ford Motor Co.'s motion to dismiss Defendant Robert Lane's counterclaims. Lane stipulates to the dismissal of Count I, a SLAPPback claim. Count II alleges an Antitrust violation by Ford in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Lane seeks treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15. As discussed below, Lane cannot establish antitrust injury, nor does he otherwise have standing to bring suit

under the Clayton Act. Accordingly, the motion to dismiss Count I and II of Defendant's counterclaim is GRANTED.

## I. Facts

Plaintiff Ford Motor Company filed this lawsuit on August 25, 1999 seeking to restrain Defendant Robert Lane from disseminating Ford documents on his website, www.blueovalnews.com. Lane filed an answer and a counterclaim alleging three counts: a SLAPPback claim which he agrees should be dismissed, an antitrust claim, and a claim for invasion of privacy.[1]

The antitrust claim alleges a violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Lane asserts that prior to 1984, Ford, General Motors, and Chrysler were bound by a consent decree "to cease their prior collusion on automotive fuel-economy and emissions features." (Countercl. at ¶ 17). He alleges that the consent decree elapsed in 1984, but that sometime after that executives of the three automakers "reached a 'gentlemen's agreement' to resume their former collusion." *Id.* at ¶ 19. In 1997, Lane avers that "[i]t was widely reported in the media ... that Ford had 'broken ranks' with the other auto makers and had decided to stop its collusion with them ..." *Id.* at ¶ 21. Lane claims that between 1984 and 1997, "Ford had the capability to produce higher-mileage, lower-emissions cars and trucks but chose not to because of their 'gentlemen's agreement' with other auto makers." *Id.* at ¶ 23. Because of the alleged collusion, Lane, who owns three Ford vehicles allegedly manufactured during 1984 and 1997, claims to have suffered "higher gasoline costs." *Id.* at ¶¶ 22, 24. This, Lane contends, constitutes a violation of the Sherman Antitrust Act. He seeks treble damages for the violation under section 4 of the Clayton Act.

## II. Standard for Motion to Dismiss

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) this Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *In re DeLorean Motor Company*, 991 F.2d 1236, 1240 (6th Cir.1993). The complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Elliot Co., Inc. v. Caribbean Utilities Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir.1975). In a light most favorable to plaintiff, assuming all allegations are true, the court must determine whether the complaint states a valid claim for relief. A motion to dismiss a complaint for failure to state a claim should not be granted "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citations omitted).

## III. Analysis

The Sherman Antitrust Act declares illegal every contract in restraint of trade. 15 U.S.C. § 1. Section 4 of the Clayton Act broadly defines the class of persons entitled to seek treble damages for an antitrust violation. 15 U.S.C. § 15. The relevant language provides, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained, and the costs of the suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

Although the language of the statute is sweeping on its face, the United States Supreme Court has limited its scope by setting forth several factors which must be considered before a plaintiff is deemed to have antitrust standing. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459

---

1. Ford does not move to dismiss the count for invasion of privacy at this time.

U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The application of section 4 "has of necessity been judicially confined to limit the remedy available thereunder to particular classes of persons and for redress of particular forms of injury." *Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983); *see also Valley Products Co., Inc. v. Landmark, A Division of Hospitality Franchise Systems, Inc., et. al.,* 128 F.3d 398, 402–03 (6th Cir.1997).

## A. Antitrust Injury

■ As a predicate to standing, the plaintiff must allege to have suffered "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp., v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Valley Products Co., Inc. v. Landmark,* 128 F.3d 398, 402–03 (6th Cir.1997)("Without antitrust injury, no private antitrust action will lie at law or in equity." *Id.* at 402.); WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 8.03[1][a] (1999). This definition involves "two separate analytical issues. First, the claimed injury must be of a type that the antitrust laws were meant to discourage. And second, the plaintiff's injury must be causally related to the defendant's anti-competitive acts." *Id.* As the *Brunswick* Court stated, "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690, quoting *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)(footnote omitted).

■ This requirement means that "it is not enough for a plaintiff to show that it has sustained injury causally connected to acts of the Defendants that violate the antitrust laws." *Belcher Oil Co. v. Florida Fuels, Inc.,* 749 F.Supp. 1104, 1107 (S.D.Fl.1990). Rather, "[b]eyond this, the plaintiff must show that 'the defendants' activities have the effect of stifling competition' ... and that the plaintiff's injury flowed from that anticompetitive effect." *Id.,* quoting *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 723 (11th Cir.1984).

■ The Sixth Circuit applies a two-pronged test in this context, requiring the plaintiff to show "(1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Tennessean Truckstop, Inc. v. NTS, Inc.,* 875 F.2d 86, 88 (6th Cir.1989), quoting AREEDA & HOVENCAMP, ANTITRUST LAW ¶ 334.1b at 299 (1988 Supp.); *see also, Baum Research and Development Co., Inc., et. al. v. Hillerich & Bradsby Co., Inc., et. al.,* 31 F.Supp.2d 1016, 1022 (E.D.Mich.1998).

Although the parties gloss over the requirement of antitrust injury, the Court finds it analytically important to discuss. The first prong of the antitrust injury test requires the plaintiff to show that the alleged violation has the effect of "reduc[ing] competition in some market." *Tennessean Truckstop,* 875 F.2d at 88. A plaintiff cannot satisfy the first prong of the test unless it is contended that the alleged illegal agreement has reduced competition in the relevant market as a whole. *Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 486–87 (D.C.Cir.1996); *Baum Research and Development Co., Inc. v. Hillerich & Bradsby Co., Inc.,* 31 F.Supp.2d 1016, 1022 (E.D.Mich.1998)("Baum has not averred that competition in the amateur baseball market is at all reduced by virtue of the alleged conspiracy to manipulate the rules for baseball bats." *Id.*)

■ Lane has not alleged that there has been a reduction of competition in any market. His antitrust claim boils down to an allegation that Ford could have produced a more fuel-efficient vehicle but declined to do so. The Sixth Circuit recently

discussed efficiency and inefficiency in the marketplace, in the context of explaining the basic economic principles underlying what antitrust laws are designed to protect and prevent. The court of appeals stated:

> Ordinarily, when an efficient enterprise displaces an inefficient one, we conclude that consumers' economic interests are better served, despite that the inefficient enterprise is injured or even destroyed. Conversely, when inefficiency triumphs over efficiency, consumers lose because they receive lower-quality, higher priced products and services .... [A]ntitrust doctrine provides a methodology for courts to distinguish between instances of efficiency displacing inefficiency, which is not, per se, an economic harm and for which the law offers no redress, and inefficiency displacing efficiency, which, if achieved by the use of unfair means, the law seeks to prevent or rectify. In general, then, *antitrust law seeks to identify situations in which enterprise organizations rely on sheer economic power to drive out an innovative but less powerful rival,* rather than attempting to do so by improving the quality or lowering the cost of their products or services.

*Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1000 (6th Cir.1999).

Lane does not allege that the collusive agreement had any anticompetitive effect on the market as a whole. As the United States Supreme Court has instructed, "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Lane cannot satisfy the first prong of the antitrust injury test, because "there is no well-pleaded allegation that [Ford's] ... conduct injured the competitive structure of the market." *Naso v. Park,* 850 F.Supp. 264, 271 (S.D.N.Y.1994).

Having pointed out this fatal defect, the Court recognizes that in the context of a private antitrust action, "the court should assume the existence of a violation and then ask whether the standing elements are shown." AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 360f.[2]

### B. Antitrust Standing

■ Even assuming Lane could establish antitrust injury, such injury is not sufficient to confer standing upon him. *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110, n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Axis S.p.A. v. Micafil, Inc.,* 870 F.2d 1105, 1111 (6th Cir.)(even where antitrust injury is shown, standing may be denied based on an analysis of other factors), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989). A plaintiff must also meet other antitrust standing requirements. The standing issue turns on an analysis of the following factors, first enunciated by the Supreme Court in *Associated General Contractors of California, Inc. v. California State*

---

**2.** The Court recognizes that antitrust injury and antitrust standing are often confused. As the court in *Baum Research and Development Co., Inc., et. al. v. Hillerich & Bradsby Co., Inc. et. al.,* 31 F.Supp.2d 1016 (E.D.Mich. 1998) explained:

> This confusion occurs because the two concepts "share a common ingredient." The common ingredient is that both requirements limit "recovery to those who have been injured by restraint on competitive forces in the economy." Any inquiry to determine whether antitrust injury has been shown is more limited than one to determine whether the plaintiff has standing.

The single determinant of antitrust injury is whether the plaintiff has suffered an "injury the type the antitrust laws were intended to prevent and that flows from that which makes [a defendant's] act[ ] unlawful." On the other hand, even if an antitrust injury is shown sufficiently, standing may be denied on the basis of other factors. The purpose of the additional inquiries is to confine recovery to cases that promote the congressional intent to ensure that consumers receive the benefits of competitive markets. *Id.* at 1021, n. 6, citing *Axis S.p.A. v. Micafil, Inc.,* 870 F.2d 1105, 1110–11 (6th Cir.1989) (citations omitted).

*Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and recognized by the Sixth Circuit in *Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983):

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;
>
> (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;
>
> (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;
>
> (4) the potential for duplicative recovery or complex apportionment of damages; and,
>
> (5) the existence of more direct victims of the alleged antitrust violation.

*Southaven,* 715 F.2d at 1085; *see also Re/Max Int'l Inc., et. al. v. Realty One, Inc.,* 173 F.3d 995, 1022 (6th Cir.1999); *Bodie–Rickett and Assocs. v. Mars, Incorp.,* 957 F.2d 287, 290 (6th Cir.1992). No single factor is outcome determinative. *Province v. Cleveland Publishing Co.,* 787 F.2d 1047, 1051 (6th Cir.1986). The Court will address the factors logically, rather than chronologically.

**1. Directness of the Injury and Speculative Nature of Damages; the Potential for Duplicative Recovery or Complex Apportionment of Damages; and the Existence of More Direct Victims of the Alleged Antitrust Violation**

■ These three factors will be dealt with together because they are closely related. *Bodie–Rickett and Assocs. v. Mars Inc.,* 957 F.2d 287, 292 (6th Cir.1992). The seminal case of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), established the "indirect purchaser doctrine." The gravamen of the doctrine is that those who do not

purchase directly from the alleged antitrust violator lack standing to sue under section 4 of the Clayton Act. *Illinois Brick,* 431 U.S. at 729, 97 S.Ct. 2061; *Jewish Hospital Assoc. v. Stewart Mechanical Enterprises, Inc.,* 628 F.2d 971, 973 (6th Cir.1980); WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK, § 8.03[2].

The genesis of the ruling in *Illinois Brick* was the high court's decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) which prevented antitrust defendants from using a "pass-on" defense against direct purchaser plaintiffs. A "pass-on" defense asserts that a direct purchaser has no antitrust injury because it has " 'passed along' any injury sustained by it in the form of higher prices to its customers." HOLMES, at § 8.03[2]. In *Illinois Brick,* the Court disallowed the offensive use of the pass-on theory by indirect-purchaser plaintiffs who attempted to demonstrate injury by proving "that the overcharge was passed on to them through intervening links in the distribution chain." *Illinois Brick,* 431 U.S. at 727–28, 97 S.Ct. 2061.

An "indirect purchaser" is one who is not the "immediate buyer from the alleged antitrust violator[ ]." *Kansas and Missouri, et al. v. UtiliCorp United, Inc.,* 497 U.S. 199, 207, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). In *Illinois Brick,* the Court held that the State of Illinois had no standing to assert a claim for treble damages under the Clayton Act based upon an alleged price-fixing scheme by concrete block manufacturers where the state did not purchase concrete block directly from the defendants. *Id.* at 728–29, 97 S.Ct. 2061.[3] The Court recognized the policy upon which *Hanover Shoe* rested:

> [W]e understand *Hanover Shoe* as resting on the judgment that the antitrust laws will be more efficiently enforced by

**3.** There are narrow two exceptions to the indirect purchaser doctrine: (1) cases involving "cost-plus" contracts and (2) cases alleging that "the direct purchaser is owned or

controlled by its customer." *Illinois Brick,* 431 U.S. 720, 736 and n. 16, 97 S.Ct. 2061, 52 L.Ed.2d 707. Neither exception is pled or argued here.

concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

*Illinois Brick,* 431 U.S. at 734–35, 97 S.Ct. 2061.

The Court noted two basic reasons for empowering direct purchasers, and not indirect purchasers, with the ability to sue for treble damages. First, the Court determined that it is more efficient to allow direct purchasers to recover, rather than to allow recovery by those situated more remotely down the chain of distribution. The Court noted that allowing indirect purchasers to recover "would create a serious risk of multiple liability for defendants." *Id.* at 730, 97 S.Ct. 2061. The only way to decrease this risk would be to join all potential plaintiffs as parties to the suit, which in most cases would be nearly impossible, particularly where the product has been incorporated into a consumer good. Moreover, as the Sixth Circuit has noted, "joining all direct and indirect purchasers in a single suit would transform antitrust actions into massive damage apportionment proceedings whose complexity would increase the overall cost of litigation, diffuse the benefits of bringing a treble damages action, and thereby reduce the incentive to sue." *Jewish Hospital,* 628 F.2d 971 at 974, citing *Illinois Brick,* 431 U.S. at 745, 97 S.Ct. 2061.

The same concerns enunciated in *Illinois Brick* are present here. Lane is not a direct purchaser of Ford's product. Although he does not say how he obtained the vehicles, the Court assumes that he purchased them either from a dealership or from some other third party in the used vehicle market. Indirect purchasers are "those who bought an illegally monopolized or cartelized product or service through the agency of a dealer, distributor, or some other independent reseller who was not a participant in the antitrust violation." Herbert Hovencamp, *The Indirect–Purchaser Rule and Cost–Plus Sales,* 103 Harv.L.Rev. 1717, 1717(1990); *see also*

*Campos, et. al. v. Ticketmaster Corp., et. al.,* 140 F.3d 1166, 1169 (8th Cir.1998).

As an indirect purchaser, Lane does not have standing to sue. There are more direct potential plaintiffs who can better address the concerns of the antitrust laws, such as the dealerships which purchase directly from Ford. Because they purchase many vehicles from Ford each year, direct purchasers can reasonably be expected to have the economic incentive to bring actions against agreements that diminish the value of the vehicles they purchase. As the Court in *Associated General* noted, "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." *Associated General,* 459 U.S. at 542, 103 S.Ct. 897.

Further, Lane's damages did not occur in the relevant market. He does not allege that he suffered any injury in the automobile market, wherein the alleged conspiracy occurred. Lane's injury occurred in the market for gas purchased at retail, in which neither Ford, nor its alleged co-conspirators participate. *See Bodie–Rickett and Assocs. v. Mars, Inc.,* 957 F.2d 287, 291 (6th Cir.1992)(denying standing where injury did not occur in market where unlawful restraint was allegedly carried out).

Lane's damages are also remote and highly speculative. Lane argues that only he suffered the increased gas costs associated with his vehicles and that his damages are easy to measure because the mileage on his vehicles is certain. He claims that "[t]he price of fuel that he has paid over the life of his Ford vehicles is certain"[,] and that "Ford's ability to increase the fuel economy of its cars and light trucks is capable of determination from Ford's own internal documents." Def's Corrected Br. at 8. The Court questions whether these items are actually certain or easily capable of determination,

especially the exact price Lane paid for gas for each vehicle during the years in question, however, even assuming that they are "certain," Lane has oversimplified his damages calculation.

In a factually-similar setting, the Ninth Circuit denied antitrust standing to plaintiff-farmers who claimed that the defendants, automobile manufacturers, conspired to eliminate competition in the research and development of vehicle air pollution equipment. *In re Multidistrict Vehicle Air Pollution,* 481 F.2d 122 (9th Cir.1973). The farmers contended that their injury constituted lost profits due to a reduction in agricultural productivity which was allegedly caused by the collusive agreement. As Areeda and Hovencamp explain in their treatise,

> The court correctly denied standing. It would have been too difficult even to guess about the degree to which the conspiracy affected auto emissions in the relevant time period; about the degree to which any reduction of such emissions would have affected air quality over the various farm lands in question; about the degree to which any improvement in air quality could have improved agricultural productivity, which was greatly affected by other factors; and about the relationship of any productivity change to actual output, price levels, and net profits. The connections were so tenuous, the court wisely refused to begin the inquiry.

Areeda & Hovencamp, Antitrust Law § 364(b) (1995).

Lane's claim presents similar remoteness concerns. In order to prove the damages he has sustained, Lane must do more than produce his gas receipts between 1984 and 1997. As Ford points out, he would have to show what commercially viable fuel-economy and emissions technologies existed during the relevant time period, that they were available to Ford, and that they would have been implemented but for the alleged agreement. The effect the use of these technologies would have had on emissions and fuel economy and on other aspects of automobile performance, would have to be ascertained. Similarly, the cost-feasibility of using those technologies would have to be analyzed, as well as their effect on output and purchase price. The effect the technologies would have had on the use and consumption of gas would have to be determined, especially with regard to the conditions under which Lane operated his vehicles.[4]

The speculative nature of Lane's damages, not only sheds doubt on what may have caused his "injury", but it also militates against finding standing. *Associated General,* 459 U.S. 519, 542, 103 S.Ct. 897, 74 L.Ed.2d 723 ("Partly because it is indirect, and partly because the alleged effect on the Union may have been produced by independent factors, the Union's damages claim is also highly speculative." *Id.*).

Lane argues that the indirect purchaser doctrine of *Illinois Brick* does not apply to him because this is not a price-fixing case. His argument is without merit for several reasons. First of all, Lane does nothing to meaningfully distinguish this from the price-fixing setting,[5] nor does he suggest what type of antitrust rubric this case is supposed to fall into. Second, even though it is not a price-fixing case, similar concerns with respect to the speculative na-

---

4. These same concerns also affect the final two prongs of the test, i.e. the causal connection between the plaintiff's injury and whether the injury was intended; and the nature of the injury and the status of the plaintiff, discussed *infra*.

5. The United States Supreme Court has compared refusal-to-compete agreements with price-fixing agreements. *See Federal Trade Commission v. Indiana Federation of Dentists,*

476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)("A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them." *Id.* at 459, 106 S.Ct. 2009.)

ture of damages and causation are attendant here.

Further, and even more importantly, the concerns recognized in *Illinois Brick* have been applied outside of the price-fixing context by the United States Supreme Court. In *Associated General,* the seminal case from which the courts have gleaned the five part test applied here, the Court discussed both *Hanover Shoe* and *Illinois Brick* in applying the directness/indirectness of the injury prong. *Associated General,* 459 U.S. at 543–545, 103 S.Ct. 897. *Associated General* was not a price-fixing case. It was a case by a union against a multi-employer association and its members, alleging that defendants "coerced certain third parties, as well as some of the association's members, to enter into business relationships with nonunion firms." *Id.* at 520, 103 S.Ct. 897. In finding that the union lacked standing, the Court recognized the "strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits." *Id.* at 543, 103 S.Ct. 897. After summarizing the holdings from both *Hanover Shoe* and *Illinois Brick,* the Court noted that "the same concerns should guide us in determining whether the Union is a proper plaintiff under § 4 of the Clayton Act." *Id.* at 544, 103 S.Ct. 897.

The Court reasoned that

if the Union's complaint asserts a claim for damages under § 4, the District Court would face problems of identifying damages and apportioning them among directly victimized contractors and subcontractors and indirectly affected employees and union entities. It would be necessary to determine to what extent the coerced firms diverted business away from union subcontractors, and then to what extent those subcontractors absorbed the damage to their businesses or passed it on to employees by reducing the workforce or cutting hours or wages.

*Id.* at 545, 103 S.Ct. 897.

Thus the Court applied the rationale behind the indirect purchaser doctrine to a non-price-fixing case. This case is indistinguishable from *Associated General.* In the instant case the Court would similarly face the problem of identifying damages, as discussed above, and apportioning the damages between the direct purchaser dealerships and consumers like Lane. Further, it would be necessary to determine to what extent the alleged collusive agreement affected the competitive nature of the auto market, and to what extent the dealerships may or may not have absorbed any negative impact, or whether it passed it along to its customers.

The Court is convinced that the strong interests identified above, standing alone, prevent Lane from establishing standing. However, the remaining two factors do not rest in his favor either.

## 2. Causal Connection and Intent

The Court must also consider the causal connection between the antitrust violation and the harm to the plaintiff and whether that harm was intended to be caused. The alleged antitrust violation here is that Ford colluded with two other car manufacturers not to compete with respect to fuel-economy features. This, Lane alleges, resulted in lower fuel economy for drivers of Ford vehicles. The harm Lane alleges is that he, as a driver of Ford vehicles, incurred higher gasoline costs. Lane baldly asserts that "Ford intended that drivers of its vehicles pay the higher fuel bills resulting from its agreement not to compete regarding fuel economy," and that "[t]he necessarily intended result of this collusion was lower fuel economy for drivers of Ford vehicles, resulting inevitably in damages to them." Def's Corrected Resp. at 4.

In assessing the nature of the Plaintiff's injury in *Associated General,* the Supreme Court noted the Sherman Act's purpose. The Court stated, "[T]he Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market." *Associated General,* 459 U.S. at 538, 103 S.Ct. 897.

As discussed previously, Lane's assertions do nothing to suggest that Ford's actions negatively impacted competition in the market for automobiles.[6] Lane's oversimplified attempt to connect Ford's conduct with his injury fails. *See, e.g., Rebel Oil Co. v. Atlantic Richfield Co.*, 957 F.Supp. 1184, 1196 (D.Nev.1997)(plaintiff need not rule out all other possible sources of injury, but must show that anticompetitive conduct was a "material cause" of his injury).

Further, Lane does not meaningfully allege that Ford intended his harm. It is difficult to understand how or why Ford's agreement not to compete concerning fuel efficiency would have the intended effect of increasing Lane's gas costs. It is difficult to identify what Ford would stand to gain through such an arrangement, unless there were some allegation that Ford gained something from the gas industry for having agreed to such an arrangement. That is not alleged here. *See, e.g., In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 129 (9th Cir.1973)("not only were the crop farmers not targets of the alleged conspiracy, they were not even on the firing range." *Id.*); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 251 (2d Cir.1985)(no antitrust injury where plaintiff did not allege anti-competitive effect, and defendants stood nothing to gain from inhibiting competition for general contractors.) Indeed, Ford's motive may have been to keep the cost of its automobiles low, assuming fuel economy features are costly to incorporate into a vehicle, or would otherwise increase the cost of the vehicle. This motive would favor Lane. The motive may have even been to keep the prices of the cars at an inflated rate, but that is not the allegation here. Lane does not allege that the motive of the agreement was to negatively affect any economic factor in the relevant auto market, but rather that it was to negatively affect consumer consumption in the related gas market. That Ford's motive was to increase the cost of gas to its customer base is speculative, at best. Even assuming that this alleged improper motive is accurate, "an allegation of improper motive ... is not a panacea that will enable any complaint to withstand a motion to dismiss." *Associated General*, 459 U.S. at 537, 103 S.Ct. 897. This factor militates against standing because of the remote connection between the alleged violation and Lane's injury.

### 3. Nature of the Injury and Status of the Plaintiff

■ Ford seems to concede that this factor favors Lane. The Court is not convinced that it does. The recent Sixth Circuit case of *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir.1999) involved a suit brought by a large national real estate franchisor, alleging that two local real estate firms in northeast Ohio violated the antitrust laws by paying lower commissions to the plaintiff's agents. In assessing the nature of the plaintiff's injury with respect to this factor, the court of appeals focused on the fact that "sufficient evidence exists to conclude that adverse commission splits are anticompetitive." *Id.* at 1023. The defendants in *Re/Max* admitted that they intended to thwart the plaintiff's attempt to recruit defendant's agents through the use of adverse splits, a commission sharing policy which adversely affected plaintiff's agents. *Id.* at 1001, 1003. In *Re/Max* it was also alleged that defendants were attempting to establish a real estate monopoly in northeast Ohio. *Id.* at 1001. There are no such similar allegations here. Further, there is no admission by Ford that the intended effect of the

---

**6.** Compare *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)(finding standing where "Plaintiff allege[d] that Blue Shield sought to induce its subscribers into selecting psychiatrists over psychologists for the psychotherapeutic services they required, and that the heart of its scheme was the offer of a Hobson's choice to its subscribers. Those subscribers were compelled to choose between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by foregoing treatment by the practitioner of their choice." *Id.* at 483, 102 S.Ct. 2540.)

agreement was to raise Lane's gas prices. Although Lane has alleged this was the intent, and the Court will assume it was the intent, this alone does not militate in favor of standing. *Associated General*, 459 U.S. 519, 537, 103 S.Ct. 897, 74 L.Ed.2d 723.

In *Associated General*, the Court found that this factor militated against standing because the Union-plaintiff was neither a consumer nor a competitor in the market at issue. *Id.* at 538, 103 S.Ct. 897. In recognizing plaintiff's status the Supreme Court pointed out that "[The Union] has not even alleged any marketwide restraint of trade." *Id.* at 540, n. 40, 103 S.Ct. 897. Although Lane is a consumer in the automobile market, his status as a consumer does not automatically confer standing upon him. Here, as in *Associated General*, there is no allegation that the collusive agreement had any marketwide effect on competition. Furthermore, it is plausible that the collusive agreement enhanced competition in that it may have had the effect of encouraging competitors of the Big Three to create more fuel efficient cars, which were available in the marketplace for Lane to purchase.[7] Lane does not allege that the market power of the three parties to the collusive agreement drove other, more fuel efficient cars from the market. This factor does not favor a finding that Lane has standing.

For all of the reasons discussed above, the Court finds that Robert Lane lacks standing under section 4 of the Clayton Act.

## VI. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

The Plaintiff's motion to dismiss Defendant's counterclaims for SLAPPback (Count I) and Antitrust (Count II) is GRANTED.

IT IS FURTHER ORDERED THAT Counts I and II of Defendant's counterclaim be DISMISSED WITH PREJUDICE.

SO ORDERED.

---

7. "At its most fundamental level, the antitrust injury requirement precludes any recovery for losses resulting from competition, even though such competition was actually caused by conduct violating the antitrust laws." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 362a.